| | | |
|---|---|---|
| RM, by and through his parents, MM and DM, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| CHARLOTTE-MECKLENBURG COUNTY BOARD OF EDUCATION, ANN CLARK, Individually and in her Official Capacity, ERNEST SAXTON, Individually and in his Official Capacity, MARGIE BRICE, Individually and in her Official Capacity**,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**THIS MATTER** is before the Court on Defendants' Motion to Dismiss (Doc. No. 10), Plaintiffs' Memorandum in Opposition of Defendants' Motion to Dismiss (Doc. No. 13), and Defendants' Reply to the Response to the Motion to Dismiss (Doc. No. 14). The parties' motions are ripe for disposition.

## I.     Background

Plaintiff RM is an eleven-year-old fifth grader. (Doc. No. 1 at 3). At the time of alleged conduct RM attended Highland Creek Elementary School. *Id.* at 4. The Defendants have adopted the Plaintiffs' factual allegations alleged in Plaintiffs' Complaint for purposes of their Motion to Dismiss. (Doc. No. 11 at 2). These factual allegations are detailed below.

On September 4, 2014 RM told Student 1 that he was deathly allergic to cashews and pistachios to which Student 1 responded that RM should "watch out" because he was going to bring nuts to school the next day. (Doc. No. 1 at 5). RM's mother, MM, called the school about the incident and emailed Principal Saxton on September 7, 2014 requesting a meeting about the incident. *Id.* at 6.

The next day, the school held a meeting with RM, his parents, Principal Saxton, the assistant principal, school counselor Stacey Kata, the school nurse, and several other district staff. *Id.* At that meeting RM and his parents were told that Student 1's comments would be treated as a 26c violation and handled accordingly. *Id.* In addition, following this meeting RM met with the school counselor and the District prepared an emergency plan for RM detailing the signs of allergic reaction and the appropriate medical response. *Id.*

Throughout September RM and MM reported other incidents to the school involving Student 1 as well as other students. *Id.* In response, the school counselor came up with a plan for RM to place a note in a box to meet with her when an incident arose and the school increased supervision of the students. *Id.*

Despite these efforts, RM continued to be bullied. *Id.* Consequently, Plaintiffs had another meeting with Principal Saxton, guidance counselor Stacey Kata and 4th grade teacher Mrs. Davis on September 25, 2015. *Id.* At this meeting, Plaintiffs expressed that they believed more significant action needed to be taken to stop the bullying. *Id.* at 7.

The next day, Principal Saxton brought RM into his office and told RM that RM was accountable for the bullying and that the bullying situation would improve if RM was nicer to Student 1. *Id.* RM told Principal Saxton of bullying incident that occurred that day in the

lunchroom. *Id.* Principal Saxton and RM watched the surveillance tape from the cafeteria, which corroborated what RM had said. Then, Principal Saxton called Student 1 into his office and told both students that he was "hitting the reset button" and that they were to start over. *Id.* at 8.

On September 28, 2014 MM emailed Principal Saxton discussing the latest incident and her dissatisfaction with the lack of results of the previous meeting. *Id.* Then on September 29, 2014, MM hand delivered a note to Heath Morrison and sent a certified copy to the entire school board that explained the bullying RM had been subjected to over the month. *Id.* at 9. In response, Community Superintendent Dr. Hayes contacted MM the following day. *Id.* Dr. Hayes told MM that Superintendent Ann Clark called him expressing concern that action was taken to ensure RM's safety. (*Id.*). MM requested that Student 1 be removed from RM's class. *Id.* Dr. Hayes said that was not possible but offered to have RM change schools. *Id.* MM told Dr. Hayes that she had consulted an attorney who said that the District did have the option of removing the child and offered to get the attorney involved. *Id.* at 10.

On October 2, 2014 a meeting was held between the Plaintiffs, VP Brice, and Dr. Hayes. (*Id.* In it Dr. Hayes explained the behavioral plan that they would be implementing and told the Plaintiffs that it was similar to a restraining order. *Id.* Dr. Hayes also acknowledged "that things have not gone the way the needed to up until this point," including that Student 1 was not given a 26c in accordance with the Code of Student Conduct as had been discussed at the September 8, 2014 meeting. *Id.*

MM also asked if RM should have a 504 plan and due to that request the District created a detailed plan that stated that Student 1 would be removed from RM's class to be effective that day. *Id.* The plan ensured RM and Student 1 did not have lunch together and did not interact

during recess. Furthermore, the plan detailed a process for RM to report when he felt threatened through an agreed upon hand gesture to designated school staff or go to a safe place in the media center. *Id.* at 11. This was the first discipline taken against Student 1 for the bullying of RM. *Id.*

However, this plan did not end the bullying situation. The day the plan was implemented, RM was asked by Student 1's friends why Student 1 had been moved and at recess that day a friend of Student 1 would not allow RM to participate in the assigned activity at recess. *Id.* Over the next three months other bullying incidents occurred including Student 1 repeatedly joining activities RM was participating in during recess. *Id.* at 11-13.

On October 8, 2014, Student 1 was suspended for telling other students to continue to bully RM. *Id.* at 11. That day VP Brice again tried to persuade the Plaintiffs to place RM and their daughter into another school. *Id.* at 12.

On November 4 and 5, 2014, MM sent emails to Dr. Hayes about Student 1's continued bullying of RM and these emails noted that a classmate had assaulted RM's sibling KM. *Id.* There was no disciplinary consequences for this assault and KM's teacher told the Plaintiffs that she could not discipline the student due to the direction of Principal Saxton. *Id.* MM then emailed Superintended Clark on November 5 describing these latest incidents and Dr. Hayes replied that the only option left was to transfer RM and KM to another school. *Id.*

On or about November 25, 2014, Dr. Hayes, Stephanie McKineey, and the Plaintiffs held another meeting and Dr. Hayes' proposed again to move RM and KM to a different school; Plaintiffs again declined. *Id.* at 13 Then, on December 18, 2014, Plaintiffs met with Principal Saxton and Principal Saxton agreed that RM's interactions with Student 1 needed to be eliminated. *Id.*

In January 2015 the classes of RM and Student 1 began combining regularly in the same room. (*Id.* at 14). RM told MM that this was occurring April 2, 2015. *Id.* In April 2015, RM was diagnosed with Post Traumatic Stress Disorder. *Id.* at 15. On May 12, 2015 MM withdrew RM from school. *Id.*

In the Complaint Plaintiffs filed on July 5, 2016, the Plaintiffs allege eight causes of action. They are: (1) Intentional Infliction of Emotional Distress; (2) Negligent Infliction of Emotional Distress; (3) Negligent Supervision and Training; (4) Federal Constitutional Claims; (5) State Constitutional Claims; (6) violation of the Americans with Disabilities Act; (7) violation of Section 504 of the Rehabilitation Act of 1973; and (8) violation of North Carolina's Persons with Disabilities Protection Act.

## II.     Legal Standard

While, the Defendants argue numerous reasons for the dismissal of all the Plaintiffs' claims, many of their arguments invoke Rule 12(b)(6). Thus, the standard for evaluating a Rule 12(b)(6) motion is detailed here.

As a general rule, pleadings must entail "only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This standard instructs that, when faced with a Rule 12(b)(6) motion to dismiss, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Thus, a "complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and 'that a

recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, these broad requirements still "demand[] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must state a claim that "raise[s] a right to relief above the speculative level" and must contain more than "naked assertion[s] . . . without some further factual enhancement." *Twombly*, 550 U.S. at 555-57.

### III. Discussion

#### a. PLAINTIFFS' IIED, NIED & NEGLIGENT SUPERVISION AND TRAINING CLAIMS AGAINST DEFENDANT BOARD

North Carolina boards of education are entitled to governmental immunity from lawsuits that allege tortious or negligent conduct unless the Board waived governmental immunity. N.C. Gen. Stat. § 115C-42. Immunity is only waived "to the extent that the board of education is indemnified by insurance for such negligence of tort." *Id.*; *see Magana v. Charlotte-Mecklenburg Bd. of Educ.*, 183 N.C.App 146, 148, 645 S.E.2d 91, 92-93 (2007) ("With respect to immunity, a county board of education is a governmental agency, and is therefore not liable in a tort or negligence action except to the extent that it has waived its governmental immunity pursuant to statutory authority.").

At all relevant times during the Complaint, the Board did not carry any liability insurance for personal injury claims totaling less than one million dollars. (Aff. of Daniel Pliszka, ¶ 5-7). However, the Board does have two excess policies to cover certain liabilities above one million dollars. (*Id.* at ¶ 7). The first is a general liability policy purchased from Genesis Insurance Company ("Genesis"). (*Id.* at ¶ 8). The Genesis policy states that it "is not intended by the Insured to waive its governmental immunity as allowed by North Carolina General Statutes Sec. 115C-42 . . . this policy provides coverage only for occurrences or wrongful acts for which the

defense of governmental immunity is clearly not applicable." (*Id.* ¶ 10, Ex. A, p. 18, Endorsement Number 9). The policy provides that Genesis "agree[s] to indemnify the Insured for ultimate net loss in excess of the retained limit which the Insured becomes legally obligated to pay...." and "[o]ur indemnification obligation shall not arise until the Insured itself has paid in full the entire amount of its retained limit". (*Id.*, Ex. A, p. 31). The Board's retained limit is one million dollars and after payment of the retained limit, the Genesis policy covers additional liability up to five million dollars. (*Id.*, Ex. A, p. 3).

The second is an excess policy purchased from Great American Insurance ("Great American"). (*Id.* at ¶ 9). The Great American policy provides excess coverage up to fifteen million dollars. However, similar to the Genesis policy, the Great American policy is only triggered "unless and until the Insured or the Insured's 'underlying insurance' is obligated to pay the full amount of the Underlying Limits of Insurance." (*Id.* ¶¶ 11-12, Ex. B, p. 22). The Great American policy defines "Underlying Insurance" as the Genesis policy. (*Id.*, Ex. B, p. 2, 4).

So, the Board has no liability insurance that provides coverage for tort claims resulting in less than one million dollars of damages. The Board's excess coverage is only triggered for claims in excess of one million dollars and only for claims in which the Board has paid the retention amount. In other words, the excess policies never provide coverage if the Board is otherwise immune from the claim.

The North Carolina Court of Appeals has repeatedly upheld, through the process outlined above, that Defendant Board has not waived its governmental immunity. *See Doe v. Charlotte-Mecklenburg Bd. of Educ.*, 222 N.C.App. 359, 362, 731 S.E.2d 245, 247 (2012) (the appellate court noting that the trial court granted the Board's motion to dismiss for the alleged tort claims

because the Board "had not waived immunity by the purchase of liability insurance."); *Irving v. Charlotte-Mecklenburg Bd. Of Educ.*, 2013 WL 5508370 (N.C.App. October 1, 2013) (citation omitted) ("because the school board had not purchased liability insurance for any amount below the $1,000,000 coverage limit, it had not waived its immunity for any damages under $1,000,000.").

The Defendant Board has not waived its immunity and therefore the Plaintiffs' first, second, and third claims against the Defendant board are dismissed.

### b. PLAINTIFFS' NIED & NEGLIGENT SUPERVISION AND TRAINING CLAIMS AGAINST INDIVIDUAL DEFENDANTS

When a governmental worker is sued individually, or in his or her personal capacity, "our courts distinguish between public employees and public officers in determining negligence liability." *Hare v. Butler*, 99 N.C.App. 693, 699, 394 S.E.2d 231, 236 (1990). "Public officials are distinct from public employees in that officers perform discretionary actions requiring deliberation, decision and judgment, while employees perform ministerial duties that are absolute and certain." *Dempsey v. Halford*, 183 N.C.App. 637, 640, 645 S.E.2d 201, 204-05 (2007). A public official may not be held individually liable for mere negligence, but may only be liable where his/her conduct is malicious, corrupt or outside the scope of his/her authority. *Dalenko v. Wake Cty. Dep't of Human Servs.*, 157 N.C.App. 49, 56, 578 S.E.2d 599, 603-04 (2003).

The test for public official immunity requires that: 1) the position is created by the constitution or statutes; 2) the public official exercises a portion of sovereign power; and 3) the public official exercises discretion in his or her position, as opposed to ministerial duties. *Isenhour v. Hutto*, 350 N.C. 601, 609, 517 S.E.2d 121, 127 (1999). The North Carolina Court of

Appeals has held that school system superintendents, principals, and assistant principals are "public officials" for purpose of public official immunity. See *Farrell v. Transylvania County Board of Educ.*, 175 N.C.App. 689, (2006); *Gunter v. Anders*, 114 N.C.App. 61, (1994).

Here, Individual Defendant Ann Clark is the Superintendent of Charlotte-Mecklenburg Schools and Individual Defendants Ernest Saxton and Margie Brice are the principal and assistant principal of Highland Creek Elementary School. Thus, all three of the individual defendants are public officials. As public officials, they are immune from claims of mere negligence brought against them in their individual capacities. Claim Two is alleges the negligent infliction of emotional distress and claim three alleges negligent supervision and training. In order to overcome the presumption of good faith provided by the public official immunity doctrine, Plaintiffs must demonstrate that Individual Defendants' conduct was malicious, corrupt, or outside the scope of their authority.

As a general rule, it is presumed that a public official "acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest." *Greene v. Town of Valdese*, 306 N.C. 79, 82, 291 S.E.2d 630, 632 (1982). "[A] conclusory allegation that a public official acted willfully and wantonly should not be sufficient, by itself, to withstand a Rule 12(b)(6) motion to dismiss. The facts alleged in the complaint must support such a conclusion." *Meyer v. Walls,* 347 N.C. 97, 114, (1997).

The Plaintiffs have failed to allege facts beyond their conclusory allegations in their complaint that any of the individual defendants acted maliciously, corruptly, or outside the scope

of his/her authority. There are no facts that the Court has found to support such an allegation and the Plaintiffs did not point to any such facts in their response.

Additionally, the Complaint contains facts that show that all of the individual defendants did attempt to address the situation and end the harassment and bullying through multiple meetings between school officials and Plaintiffs. (Doc. 1, ¶¶ 29-33, 36, 61, 86). Out of these meetings strategies to end the bullying situation were implemented including (1) increased supervision by school employees (Id. ¶; 35); (2) altering class schedules so that the minor Plaintiff would not be in the offending student's same classroom and developing a behavior plan (Id. ¶ 63); (3) developing a safety plan for minor Plaintiff (Id. ¶ 33); and (4) the implementation of a 504 Plan specifically addressing the bullying and harassing issues (Id. ¶ 66-68).

For these reasons, claims two and three against the individual defendants are dismissed.

### c. PLAINTIFFS' IIED CLAIM AGAINST INDIVIUDAL DEFENDANTS

The first claim alleges a claim of intentional infliction of emotional distress against the individual defendants. The elements of an action for IIED are "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." See *Hogan v. Forsyth Country Club*, 79 N.C.App. 483, 487-88, 340 S.E.2d 116, 119 (1986). The standard in North Carolina for what constitutes extreme and outrageous behavior is "a stringent one." *Waddle v. Sparks*, 331 N.C. 73, 83 (1992). "To meet the essential element of extreme and outrageous conduct, the conduct must go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community." See *Wagoner v. Elkin City Schools' Bd. of Educ*. 113 N.C.App. 579, 586, (1994).

The Plaintiffs have not alleged actions "so extreme and outrageous that they exceeded all bounds usually tolerated by decent society." *Dickens v. Puryear*, 302 N.C. 437, 447 (1981). Consequently, the Plaintiffs' IIED claim necessarily fails.

The Plaintiffs allege that the individual Defendants did not follow the school's rules and policies by failing to discipline the student bullying RM frequently enough and blaming RM for the harassment and assault by suggesting that he transfer schools. (Doc. 13 p. 14). However, in the alleged facts it is also clear that the individual Defendants took numerous measures to address the bullying situation and the Plaintiffs' dissatisfaction with these actions does not make the Individual defendants' conduct extreme and outrageous. The measures taken were outlined in the previous section and include: a) multiple meetings, interactions and follow-up meetings between school officials and Plaintiffs throughout the period alleged in the Complaint; b) increased supervision of Student 1 (alleged bully) and RM by school employees; c) removing Student 1 from minor Plaintiff's class and altering class schedules so that the Plaintiff would not be in the same classroom and developing a behavior plan; d) developing a safety plan for minor Plaintiff; and e) the implementation of a 504 Plan specifically addressing the bullying and harassing issues. (*See* Doc. No. 1).

The Complaint does not contain facts of outrageous conduct beyond the bounds tolerated in a decent society committed by individual defendants to support an IIED claim. Therefore, the first claim against the individual defendants is dismissed.

### d.  PLAINTIFFS' FEDERAL CONSTITUTIONAL CLAIMS

In their Fourth Cause of Action, Plaintiffs allege, through 42 U.S.C. § 1983 ("Section 1983") that Defendants violated Plaintiffs' federal constitutional rights, specifically, under the Fifth and Fourteenth Amendments of the Constitution.

### i. Defendant Board is not liable through *respondeat superior* for individual defendants' actions nor is it directly liable

In *Monell v. Dept. of Social Services of City of New York*, the United States Supreme Court held that "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. 658, 691 (1978). *See also Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). But, a municipality may still be liable under section 1983 where the alleged injury was caused by "an identifiable municipal policy or custom." *Riddick v. Sch. Bd. of the City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000) (citation omitted). "[W]hen an alleged constitutional deprivation is caused by the official actions of those individuals 'whose edicts or acts may fairly be said to represent official policy,' the government as an entity is responsible under section 1983." *Id.* (citing *Monell*, 436 U.S. at 694).

A municipal policy or custom arises in four ways:

(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citing *Carter v. Morris*, 164 F.3d 217 (4th Cir. 1999)).

The Plaintiffs have failed to provide any factual allegations to support their claim that the Defendant Board implemented a policy that caused the alleged deprivation of the Plaintiffs' Fifth and Fourteenth Amendment rights. All that the Complaint contains in support of this claim are conclusory allegations without additional supporting facts such as stating that the Defendants "implemented a custom and/or policy of grossly failing to screen, hire, train, retain, and supervise its teachers, EC teachers and assistants, and other school employees properly." (Doc. 1 p. 20); *See Twombly*, 550 U.S. at 555-57.

Consequently, the Plaintiffs' federal constitutional claims against the Defendant board fail.

### ii. Individual Defendants

In addition to the municipal Section 1983 liability against Defendant Board, Plaintiffs bring claims against the three individual defendants, in their individual capacities under section 1983 for violation of RM's equal protection rights under the Fifth and Fourteenth Amendment, violation of RM's parents' substantive due process rights under the Fifth and Fourteenth Amendment, and other violations of RM's constitutional rights to be learned about at trial.

The allegations in Plaintiffs' Complaint are disorganized on multiple important points: 1) which Individual Defendants are being sued in their individual capacities; 2) and for what reasons; 3) which Individual Defendants committed the alleged unconstitutional acts; and 4) whether the alleged constitutional acts were committed against the minor Plaintiff and/or all the Plaintiffs. The "global manner of pleading made the claims at issue less plausible." *Barrett v. Board of Educ. Of Johnston County, N.C.*, 590 Fed.Appx. 208, 211 (4th Cir. 2014). This is even more troublesome considering that there are no facts put forth to show that one of the individual

defendants, Superintendent Clark, ever interacted with RM at the time of the alleged violations. *See id.*

Bare assertions that "amount to nothing more than a formulaic recitation of the elements' of a constitutional discrimination claim" cannot withstand a motion to dismiss. *Iqbal,* 556 U.S. at 681, 129 S.Ct. 1937 (quotation omitted). Plaintiffs' allegations regarding the individual defendants' liability under § 1983 for violations of the Fifth and Fourteenth Amendment are exactly the type of allegations that *Iqbal* ruled were not enough as they are wholly lacking in factual support.

Plaintiff's claims are dismissed to the extent that plaintiffs attempt to rely on "bullying and disability-based discrimination of Plaintiff RM by the individual Defendants." These allegations are entirely conclusory and unsupported by any allegation of fact describing alleged bullying or disability-based discrimination by the individual defendants.

In looking at various federal antidiscrimination statutes, courts routinely have used the deliberate indifference standard. This rule was put forth by the Supreme Court in a student-on-student sexual harassment case brought under Title IX, *Davis v. Monroe County Board of Education*, 526 .S. 629 (1999), and was extended to § 504 of the Rehabilitation Act arising out of student-on-student harassment or bullying by the Fourth Circuit, *S.B. ex rel. A.L. v. Board of Education of Harford County*, 819 F.3d 69, 75 (4th Cir. 2016).

The Court finds the Fourth Circuit's reasoning for why *Davis* applied to *S.B.* instructive in this case:

> The Court started with the well-established rule that recipients of federal funds must have adequate notice that they may be liable for certain conduct before a private damages action will be allowed. It followed, the Court concluded, that

schools may not be held liable under Title IX for the misconduct of their *students,* but only for their "*own* decision to remain idle in the face of known student-on-student harassment," (emphasis in original)—"intentional conduct that violates the clear terms of the statute." A negligent failure to learn of or react to its students' independent actions, in other words, will not subject a school to liability, but "deliberate indifference to known acts of harassment" will.

*S.B.*, 819 F.3d at 75 (citations omitted).

The Plaintiffs have failed to allege any factual foundation that the individual defendants acted with deliberate indifference towards the Plaintiff's alleged harassment and bullying. The Complaint itself is replete with examples of the efforts employed by the Individual Defendants to effectively address the situation and end the harassment and bullying which have been discussed several times before: a) multiple meetings, interactions and follow-up meetings between school officials and Plaintiffs throughout the period alleged in the Complaint (Complaint ¶¶ 29-33, 36, 61, 86); b) increased supervision by school employees (*Id.* ¶ 35); c) removing the alleged bully from minor Plaintiff's class and altering class schedules so that the minor Plaintiff would not be in the same classroom and developing a behavior plan (*Id.* ¶ 63); d) developing a safety plan for minor Plaintiff (*Id.* ¶ 33); and e) the implementation of a 504 Plan specifically addressing the bullying and harassing issues (*Id.* ¶ 66-68).

Additionally, to the extent that Plaintiffs also allege that individual Defendants violated the plaintiffs' federal constitutional rights through supervisory liability, this claim also fails.

In order to establish supervisory liability under Section 1983, a plaintiff must allege and show that:

(1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices;' and (3) there was an 'affirmative

causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Again, the Plaintiffs have failed to plead sufficient facts to make their claims anything but naked assertions. The Complaint does not provide any allegations that the Individual Defendants had actual or constructive knowledge that their subordinate employees were engaging in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to the minor Plaintiff. Plus, as explained in the previous section, there is no facts to support the allegation that the Individual Defendants acted with deliberate indifference when they learned about the concerns expressed by the Plaintiffs. To the contrary, the individual defendant took steps to stop the bullying situation.

Therefore, the Plaintiff's fourth claim against the individual defendants is dismissed.

### e. PLAINTIFFS' NORTH CAROLINA CONSTITUION CLAIMS

The Plaintiff's fifth cause of action alleges that the Defendants violated Plaintiff RM's state constitutional rights, violating Article 1 §§ 1, 15, and 19 of the North Carolina Constitution. The Plaintiffs, both in their complaint and response, only refer to the "Defendants" using that general term. However, direct claims under the North Carolina Constitution are maintainable only against the state, not against individuals. *See Corum v. Univ. of N.C.*, 330 N.C. 761, 788 (1992). Therefore, the State Constitution Claims brought against the individual Defendants in their individual capacity are dismissed.

A plaintiff can assert a direct claim under the North Carolina Constitution only when there is no adequate state remedy. *Corum*, 330 N.C. at 782; *see also Craig ex rel. Craig v. New Hanover County Bd. of Ed.*, 363 N.C. 334, (2009). For an adequate state law remedy to exist, the

remedy "must provide the possibility of relief under the circumstances", *Craig*, 363 N.C. at 340, and "the remedy would compensate the plaintiff for the *same injury* alleged in the direct constitutional claim." *Estate of Fennell v. Stephenson*, 137 N.C.App. 430, 437, (2000), *rev'd in part on other grounds*, 354 N.C. 327 (2001) (emphasis in original). "[T]o be considered adequate in redressing a constitutional wrong, a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim." *Craig*, 363 N.C. at 339–40.

Here, Plaintiffs have the opportunity to move forward with a state law remedy against the Defendant Board and the individual Defendants, thereby precluding direct claims under the North Carolina Constitution.[1] Plaintiffs' Eighth Cause of Action is their statutory claims pursuant to the North Carolina Persons with Disabilities Protection Act. The Defendant Board and the individual Defendants do not have any immunity for this claim. This claim is seeking remedy for the same injury alleged under the state constitutional claims. Thus, Plaintiffs have an adequate state statutory remedy that, if successful, would compensate them for the alleged injuries. Plaintiffs are therefore barred from asserting these direct claims against the Defendants under the North Carolina Constitution. Consequently, the Plaintiffs' Fifth Cause of Action is dismissed.

### f. PLAINTIFFS' AMERICANS WITH DIABILITIES ACT CLAIM

Plaintiff's sixth claim alleges Defendants' conduct violated "42 U.S.C. 12182 and its implementing regulations." (Doc. No. 1 at 22). However, Defendants argue that Plaintiff cannot

---

[1] In fact, the Plaintiffs stated as much in their response where they explained their reason for bringing these State constitutional claims as "the Plaintiffs pleaded State Constitutional Claims in the alternative to state law remedies." (Doc. No. 13 at 11).

prevail on a claim for violation of Title III of the Americans with Disabilities Act ("ADA") because public school systems are not subject to Title III.[2]

Under Title III of the ADA "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Public schools are operated by public entities and therefore are not public accommodations under Title III. *See* 42 U.S.C. § 12181(6) (defining a "private entity" subject to Title III as any entity other than a "public entity"); *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1036 (6th Cir.1995) (holding that Title III did not apply to discrimination on public school grounds or in public parks); *Disaabled Rights Action Committee v. Las Vegas Evants, Inc.*, 375 F.3d 861, 876 (9th Cir. 2004); *Costello v. University of North Carolina at Greensboro*, 394 F.Supp.2d 752, 760 (M.D.N.C. 2005).

There is no dispute that Highland Creek Elementary School is not a public accommodation operated by private entities and therefore Plaintiffs' claim is dismissed.

### g. PLAINTIFFS' SECTION 504 OF THE REHABILITATION ACT CLAIM

Plaintiffs' seventh claim alleges that Plaintiffs' rights under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, were violated by the Defendant and as a result "[t]he Plaintiffs have been denied participation in and benefits of a Free Appropriate Public Education ("FAPE")." (Doc. No. 1 at 22).

---

[2] Plaintiffs specifically cite to a provision of Title III in their Complaint and again in their Response memorandum (Doc. No. 13 at 6), which was filed after the Defendants pointed out this flaw in the Plaintiffs' claim in their Memorandum supporting their motion to dismiss (Doc. No. 11 at 28).

To establish a violation of section 504, Plaintiffs "must show intentional discrimination or bad faith in the denial of special education." *Sellers by Sellers v. School Bd. of Manassas, Va.*, 960 F.Supp. 1006, 1010 (E.D.V.A. 1997) (internal citations omitted). And to do that, "something more than a mere failure to provide the 'free appropriate education' required by [IDEA] must be shown." *Sellers by Sellers v. School Bd. of Manassas, Va.*, 141 F.3d 524, 529 (4th Cir. 1998) (internal citations omitted).

In their Complaint, the Plaintiffs only claim that "[a]s a result of the conduct described above, the Plaintiffs have been denied participation in and benefits of a Free Appropriate Public Education." (Doc. No. 1 at 22). The Plaintiffs do not allege any facts to support that the defendants acted in bad faith or gross misjudgment. The only fact cited by the Plaintiffs is the allegation that "[t]he OCR, in its finding in 2015, stated that the District should have, but failed to properly evaluate RM to see if his GI [Gastro-Intestinal] condition need to be included in RM's 504." (Doc. No.1 at 14). This is very similar to other cases where students have been incorrectly evaluated. In such cases "courts have been reluctant to find in mis-diagnoses the evidence of bad faith or gross misjudgment sufficient to support a discrimination claim under section 504." *Sellers*, 141 F.3d at 529 (citing *Wenger v. Canastota Cent. Schl. Dist.* 979 F.Supp. 147, 153 (N.D.N.Y. 1997); *Brantley v. Independent Schl. Dist. No. 625*, 936 F.Supp. 649, 657 (D.Minn. 1996)). Even in the light most favorable to the Plaintiff, this oversight does not appear to be evidence of bad faith or gross misjudgment.

Since Plaintiff has not alleged facts to support a claim of bad faith or gross misjudgment on the part of the defendants in failing to properly identify RM's GI sooner, their section 504 claims fails.

### h. PLAINTIFFS' NORTH CAROLINA STATUTORY DISABILITY CLAIM

Lastly, the Plaintiffs allege that the Defendants violated North Carolina's Persons with Disabilities Protections Act ("NCPDPA") "in failing to provide [the minor Plaintiff] with reasonable modifications, through its failure to develop a[nd] follow a plan." (Doc. 1, p. 23).

The NCPDPA bars any court of law from hearing an action where plaintiff has simultaneously sought relief under Section 504 of the Rehabilitation Act or the ADA based on the facts or circumstances alleged to have violated the NCPDPA. *See* N.C. Gen. Stat. § 168A-11(c) (2005); *Cone ex rel. Cone v. Randolph County Sch.*, 302 F.Supp.2d 500, 514 (M.D.N.C. 2004). The NCPDPA states in part that:

> [n]o court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under Section 503 or Section 504 of the Vocational Rehabilitation Act of 1973 ... or the Americans with Disabilities Act of 1990 ... involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter.

*Id.* § 168A-11(c). "The clear meaning of the language of N.C. Gen. Stat. § 168A–11(c) does not allow a plaintiff to file simultaneous federal and state claims, then see which one has a better chance of being successful." *Bowling v. Margaret R. Pardee Memorial Hospital,* 179 N.C.App. 815, 820-821 (2006). "Thus courts will dismiss a plaintiff's claims under the NCPDPA when they arise out of the same facts as a claim under the Rehabilitation Act or ADA." *Cone*, 302 F.Supp.2d at 514 (internal citation omitted); *See, Alston v. Becton, Dickinson and Co.*, 2013 WL 4539634 at *3 (M.D.N.C. 2013).

In this case, the Plaintiffs' NCDPA claim, ADA claim, and claim under the Rehabilitation Act all arise under the same facts and circumstances. Consequently, the Plaintiffs' NCPDPA claim is dismissed.

## IV.    Conclusion

For the reasons set forth in the memorandum opinion entered contemporaneously herewith,

**IT IS ORDERED** that Defendants' Motion to Dismiss (Doc. No. 10) is **GRANTED**.

The clerk of court is directed to close this civil case.

Signed: May 15, 2017

Graham C. Mullen
United States District Judge